UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
UNITED STATES OF AMERICA,

       -against-                                      22-CR-00552 (JMF)


EDWARD ALVARADO SEGURA,
                       Defendant
------------------------------------------------------------x


## MEMORANDUM OF LAW IN AID OF SENTECNING FOR EDWARD ALVARADO SEGURA

Christopher Wright
Wright Law, PC
299 Broadway
Suite 708
New York, NY 10007

I.     **<u>Preliminary Statement</u>**

The undersigned respectfully submits this letter in advance of Edward Alvarado Segura ("Edward") sentencing proceeding, which is scheduled for October 18, 2023, following his May 31, 2023 guilty plea, to Count One: Conspiracy to Distribute and Possess with Intent to Distribute Fentanyl in violation of 21 U.S.C. §846 and §841(b)(1)(A).

It is a universally acknowledged truth that acknowledging one's transgression is the first step towards redemption. That is precisely what Edward Alvarado Segura did following his initial arrest, by promptly admitting his criminal conduct and participating in a Safety Valve proffer where he forthrightly and honestly disclosed his offense conduct.

As detailed below Edward comes from a large and loving family who have all supported him during this difficult period in his life. Edward is a 27 year old man who is a deeply beloved son, sibling, and friend to many people; Edward now finds himself on a hopeful road to redemption and the reclamation of his life. Unfortunately for Edward his adulthood has been marked by catastrophic mistakes with self-imposed obstacles that have often become intractable challenges. Edward makes no excuses for his offense conduct and wakes up every morning in his desolate jail cell with the crushing awareness of the gravity and consequence of his criminal conduct; conduct for which he readily accepted responsibility, proffered with the government, pled guilty and now stands ready to be sentenced.

Since Edward has satisfied the conditions of 18 U.S.C. §3553(f)(1)-(5), he qualifies for "safety valve" relief, and is eligible to receive a sentence below the ten year mandatory minimum which would otherwise be required for his offense of conviction (21 U.S.C. §841(b)(1)(A)). PSR ¶71. There is no dispute between the presentence report ("PSR") and the plea agreement concerning the applicable guidelines range; both calculate Edward's U.S.S.G. guidelines range to be 108 to 135 months. PSR ¶¶5, 72. Although the Probation Department recommends a below guidelines range sentence - 85 months – for the reasons that follow we respectfully ask that the Court impose an even more appreciably below guidelines sentence. PSR at page 23 (Sentencing Recommendation).

Significantly, the United States Sentencing Commission has promulgated new rules that go into effect on November 2, 2023, providing an additional 2-level decrease for first time, nonviolent offenders like Edward who satisfy ten criteria. U.S.S.G. § 4C1.1. The new criteria for § 4C1.1 will apply to defendants: (1) with no criminal history points, (2) who did not receive a terrorism enhancement, (3) who did not use violence or threats of violence, (4) who did not cause death or serious injury, (5) who did not commit a sex offense, (6) who did not cause any victim substantial financial hardship, (7) who did not possess or use a firearm or deadly weapon, (8) who did not violate a victim's civil rights, (9) who did not commit a hate crime, and (10) who did not receive a role adjustment. U.S.S.G. § 4C1.1. The government does not contest that Edward meets all of the required criteria.

The government agrees that the Court should apply a downward variance reflecting the proposed amendment and that Edward should be sentenced as though U.S.S.G. § 4C1.1 were

2

already in effect. Although the Sentencing Commission is still considering whether the amendment will be retroactive, courts have already begun crediting defendants with the 2-level offense level reduction where the government consents. *See*, *United States v. Trunz,* No. 19-CR-00375-WFK, ECF Nos. 25-26 (E.D.N.Y. 2023); *United States v. Soong,* No. 22-CR-00372-SI, ECF Nos. 41-42 (N.D. Cal. 2023). Accordingly, we respectfully request that the Court apply this 2-level decrease to Edward's offense level, which would reduce his offense level from 31 to 29 and result in a guidelines range of 87 to 108 months' imprisonment.

The defense requests a sentence of up to 36 months or any sentence significantly below the guidelines range that the Court deems just and appropriate; a sentence which accurately reflects Edward's acceptance of responsibility, his Safety Valve proffer, his individual history and characteristics, and the nature of his offense conduct.

## II.     Legal Standard

As this Court is undoubtedly aware, the United States Supreme Court decision in *United States v. Booker*, 543 U.S. 220 (2005), has reshaped the way a sentencing judge can impose a sentence. The sentencing court may consider the U.S.S.G guideline range, as well as any basis to depart from that range. However, the court is no longer required to impose a sentence within that range. In fact, the federal sentencing guidelines are but one factor among several in determining an appropriate sentence. *Kimbrough v. United States*, 552 U.S. 85, 109 (2007).

The guidelines are only the "starting point and initial benchmark…" *Id., citing Gall v. United States*, 552 U.S. 38, 50 (2007). "Sentencing courts are not to 'presume that the Guidelines range is reasonable,' and instead they 'must make an individualized assessment based on the facts presented.'" *United States v. Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014) (internal citations omitted). It is the sentencing judge who has the advantage of familiarity with the details of the case and can best evaluate the import of the § 3553(a) factors. *Id., Kimbrough*, 552 U.S. at 109, *citing Gall*, 552 U.S. at 51.

In determining a sentence for Edward that is "sufficient, but not greater than necessary," the first of those factors the judge must consider is "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Without a doubt, the breadth of this factor alone extends far beyond the guidelines and implores the sentencing judge to consider the unique circumstances and characteristics of Edward. A consideration of those characteristics, along with the remaining six factors,[1] may render sentences that do not fit within the guidelines, yet are fair and meet the goals of sentencing set forth in § 3553(a)(2).

---

[1] The seven factors are (1) the nature and circumstances of the offense and the history and characteristics of the offender; (2) the need for the sentence imposed to reflect the goals of sentencing set forth in § 3553(a)(2); (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the applicable category of offense; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims. *See* 18 U.S.C. § 3553(a).

Therefore, the Court may not simply presume that the Guidelines range is reasonable. *Gall*, at 50. Rather, the Court must make an individualized assessment based on the facts presented. From its unique vantage, the Court may conclude that, despite the guidelines, "in a particular case, a within-Guidelines sentence is 'greater than necessary' to accomplish the goals of sentencing. . ." *Kimbrough*, 552 U.S. at 101, *citing* 18 U.S.C. § 3553(a). The not "greater than necessary" language of the federal sentencing statute incorporates the need for the sentence to "reflect the seriousness of the offense," "promote respect for the law" and "provide just punishment for the offense." 18 U.S.C. § 3553(a). Indeed, as the Supreme Court suggested in *Gall*, a sentence of imprisonment may not promote respect for the law if it appears unduly harsh in light of the real conduct and circumstances of the particular case. *Gall*, at 54; *see also Rita v. United States*, 551 U.S. 338, 351 (2007) (observing that district court may consider arguments that "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

### III.     Offense Conduct and Acceptance of Responsibility

As described in the Presentence Report, Edward conspired with his co-defendants to ship via United States Postal Service ("USPS") multi-kilograms of fentanyl and other narcotics from California to various address in the New York City area from June 2020 up until October 2022. PSR ¶¶9-12.  More specifically, Edward first appears in the conspiracy around October 2021 and was observed by law enforcement picking up USPS packages and conspiring with certain co-defendants to distribute narcotics. PSR ¶¶16-18.  Edward was a less integral member of the conspiracy compared to other co-defendants some of whom were actually shipping the fentanyl and were closer to the bulk suppliers. PSR ¶22. Indeed, Edward's role "appears limited to receiving and delivering packages of fentanyl and assisting his brother Edwin Andres Alvarado Segura in running the distribution of these packages." Id.

In his Safety Valve proffer with the government Edward was candid and sincere about his criminal behavior in this case; in essence, Edward would retrieve USPS packages that he knew contained fentanyl and/or cocaine and then would deliver them to other members of the conspiracy as he was directed.  Edward did not have direct contact with the bulk suppliers in California, the drug shipments were entirely controlled and arranged by other conspirators who in turn directed Edward at all times.  Edward was paid at most $1,500 for each package he retrieved.  Rather than simply saying "no"; Edward regretfully yielded to the temptation of making easy money and acted essentially as a delivery-man for the subject drug transactions. By all appearances Edward had a very limited history with narcotics and the instant offense conduct is his first ever arrest and conviction. PSR¶¶40-43; PSR at page 24.

 To be sure, Edward readily concedes that his role as a "delivery-man" does not minimize his offense conduct or the risks attendant to any narcotics transaction.  Edward has expressed profound remorse when he reflects upon his offense conduct and he readily admits that narcotics sales are "*not* victim-less crimes."  Edward concedes that although his comparative role in this conspiracy may have been less, he in no-way seeks to minimize his offense conduct and admits he was well aware of the true contents of those USPS packages. He further categorically accepts his indispensable role in this crime and more meaningfully he accepts his shameful role in our nation's existential struggle with narcotics abuse.

## IV.  History and Characteristics

### A.  Edward's History - "Hopeful Immigrant"

Edward was born in the Dominican Republic in 1996 and raised by hardworking and loving parents who labored to provide Edward a good childhood and instill a work ethic despite their financial deprivations. PSR ¶¶47-49.  Edward lawfully immigrated to the United States in 2015, as a teenager with his family as they longed for a better and more prosperous life here in New York City. PSR ¶54;  After his arrival in 2015, Edward immediately went to work and has remained gainfully employed in various jobs throughout his time in New York. PSR ¶¶61-66.  Edward's predominant employment has been in the service economy and more recently as a maintenance worker. Id.  It is clear that Edward's consistent work history embodies the resolute work ethic his parents imparted to him as a child.

Although Edward came to United States many years ago, he never became a US citizen. PSR ¶54.  Edward is a lawful permanent US resident, but he unfortunately faces all but certain removal proceedings as a result of this conviction. Id.  Edward is acutely aware that beyond his abiding fear of going to jail, he may well be deported to the Dominican Republic and permanently barred from re-entering the US; a prospect that haunts him as his entire life and family are here in New York.

It should be noted that Edward had been at liberty since his arrest in this case last November.  Edward abided by all the terms of his pre-trial release and remained gainfully employed the entire time he was at liberty.   Edward used that time wisely by spending time with his family and sincerely engaging in self-inquiry examining his poor decisions.

Edward was placed into custody upon his guilty plea on May 31, 2023, and has been incarcerated without incident at the Essex County Jail in New Jersey.  Edward has availed himself of any and all programs offered at his jail, doing his level best to remain positive and hopeful.  Tragically, now that he is facing the abyss of significant jail time and certain deportation, Edward truly understands the profound harm his actions have caused his family and the larger society.

### B.  Edward's Family – "Loving Community"

Edward's mother, Laura Maria Segura Rosario de Alvarado, has been a reliable, loving and dependable presence throughout his life.  Ex. A.[2]  Edward's mother is emphatic in her support for her son and maintains that upon his eventual release from jail her family will be ready to support him. PSR ¶49; Ex A at 1-2.  She is sanguine and ever hopeful that her son has

---

[2] Attached as Exhibit A are a collection of letters from Edward's family and friends, which are bate-stamped for ease of reference.  The letter from Edward's mother was translated from Spanish to English by court approved translator, Carlos Camacho, and both versions are attached as Ex A at 1-2.

learned from his tragic mistakes and is confident that Edward has found a measure of salvation and deliverance during this difficult time. Ex. A at 1-2.

Edward's sister, Rubianny Alvarado, is absolute and steadfast in her love for her brother writing that "[s]ince our childhood I have known Edward to be a person of good heart and strong moral foundations... We truly need him and life is not the same without him" Ex. A at 3. Rubianny, like their mother Laura, strikes a redemptive chord about Edward's future "I firmly believe that this incident does not represent his true character or the values he holds dear. I believe in Edward's capacity for growth, change and redemption." Id.  Speaking collectively for the family, Rubianny writes:

> We are all susceptible to making mistakes, and it is through these mistakes that we learn the most about ourselves and our potential for improvement. I am confident that Edward can learn from this experience and will work towards a better future. I am asking for understanding, for a chance to show that he is more than his mistake… I have faith in Edward's ability to overcome this challenging time and become a positive force in our society.
> Id.

Edward's step-mom, Ruth Munoz, writes very movingly on his behalf describing Edward more like her own biological son and recounting a close bond with him; fondly remembering "I met Edward when he was just a baby and since then, I have been privileged to watch him grow into a young man of notable integrity and resilience." Ex. A at 5.  Ruth expresses the shared family surprise in that Edward's offense conduct is so clearly aberrant to the Edward they all know and love, and she gives voice to a unified family vision:

> Edward is an individual who deeply values hard work. As an immigrant, he faced numerous challenges upon arriving in America.  However, instead of being disheartened, he used these obstacles as motivation, working tirelessly to create a better life for himself and his family.  I am incredibly surprised to have heard that he was involved in any criminal activity as he has always worked hard and been very humble… I believe with the right guidance and support, Edward can learn from this experience and make positive contributions to society.
> Id.

Edward's step-sister, Ambar Anglero, echoes the doggedness of Edward the expectant immigrant in the classic American tradition "his decision to move to America illustrates his incredible courage and determination… his journey from the Dominican Republic to hardworking immigrant in America, is a narrative of perseverance, passion, and unyielding spirit." Ex. A at 6.  Catastrophically for Edward, his buoyant immigrant dream now ends in a jail cell and great shame upon his family – albeit all due to terrible and selfish decisions he chose to make.

There are a total of 12 letters submitted on behalf of Edward and the defense does not see the need to go through all of them; suffice it to say they all speak to his essential decency as a human being. However, one letter in particular deserves to be highlighted as it speaks to Edwards true compassion, a letter from his cousin, Humberto Alvarado. Ex. A at 14.  Edward

and Humberto grew up together in the Dominican Republic and Humberto, who identifies as gay, described a childhood wracked by rampant homophobic bullying, but yet he found comfort, acceptance and solace in his cousin Edward, Humberto writes:

> All I remember when I look back at my childhood and time spent with him is a very caring, loving and smart boy who came from humble beginnings. I identify as a gay man, I say this because growing up in a homophobic country and culture, I grew up scared to be myself and was bullied often throughout elementary and middle school. However, Eduardito always provided a safe space for me to be myself and feel just as loved as my other cousins… I remember all these things because he has had a huge impact in my life that has shaped the way I like to carry myself and treat others.
> Id.

That Edward was kind and loving to his gay cousin in a decidedly gay-hostile culture does not in any way excuse his decision to distribute such a deadly narcotic that is fentanyl.  However, it speaks to Edward's compassion to be loving to someone in the face of societal torment and protect someone who was the target of ubiquitous public reprobate.  Hope springs eternal *that* Edward again shines after his present ordeal is over.

The assembled letters extol Edward's resolute commitment to helping other people and his dogged work ethic.  Ultimately, the abundant love demonstrated by Edward's kind and generous family turned out to be bittersweet, albeit due to his regretful decision to engage in the instant offense conduct. Paradoxically, the very people who love Edward the most, his family, have suffered the most as a result of his criminal conduct and subsequent incarceration.

Edward deeply feels the betrayal, disgrace, and humiliation his behavior has caused his family as well as the incalculable harm that narcotics visit on society.  Despite his current predicament, Edward counts himself very lucky that he has so many good people who love him and want to help him as he struggles through life and moves on from the instant criminal case.

### C. Mental Health and Physical Condition

Edward suffers from crippling anxiety and has previously been prescribed Xanax to treat his panic attacks.  PSR ¶ 57.  Since his current incarceration he has had several panic attacks but unfortunately Essex County jail is unable to treat his mental health condition so his anxiety goes unabated. Id. The Probation Department has proof from Edward's therapist which corroborates his struggles with anxiety. Id.  Edward has expressed a sincere desire to get treatment once he is sentenced and transferred to a Bureau of Prison jail.

In addition, Edward suffers from Polycythemia Vera, which according to the Johns Hopkins University School of Medicine website "is a rare blood disorder in which there is an increase in all blood cells, particularly red blood cells. The increase in blood cells makes your blood thicker. This can lead to strokes or tissue and organ damage."[3] PSR ¶56. Edward's treatment going forward for his condition involves receiving a phlebotomy every one to three months. Id. The Probation Department finds this condition to be serious enough that they are

---

[3] *See*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/polycythemia-vera

recommending Edward be designated to a Bureau of Prison ("BOP") facility that can attend to his medical condition. PSR at page 24.

I. **Conclusion**

As mentioned at the outset of this memorandum, we respectfully request the Court impose the sentence of up to 36 months or any sentence significantly below the guidelines range that the Court deems just and appropriate; a sentence that appropriately reflects all of the critical 18 U.S.C. 3553(a) factors.

First, Edward has continued to show remorse and reflect on how his criminal conduct affected society, drug abusers, his family; and an appropriate sentence of imprisonment with a period of years of supervision will undoubtedly serve as a deterrent against any future recidivism. Edward has confided that the last year that this case has been pending and his current period of incarceration have been deeply impactful upon him and he is unyielding in his desire to turn his life around.

Second, Edward's struggle with anxiety and his Polycythemia Vera medical condition is another basis for the requested sentence. Sentencing courts are mandated to consider the need to provide medical care for defendants and Edward's medical conditions certainly qualify. *See* 18 U.S.C. § 3553(a)(2)(D). As discussed in his PSR report Edward has been treated for anxiety and for Polycythemia Vera and he would unquestionably benefit from continued treatment for those ailments. To that end we respectfully request the Court consider his need and desire to receive treatment for his mental health anguish and Polycythemia Vera.

Third, The First Step Act bars sentence reductions for participating in programs for offenders who commit fentanyl conspiracies. See 18 U.S.C. § 3632(d)(4)(D)(lxvi). Normally, a non-violent controlled substance offender like Edward can expect a 10 to 15-day reduction for every 30 days of completed classes. 18 U.S.C. § 3632(d)(4)(A). But if the Court imposes a further prison sentence, he will not have the same programming incentives as other similarly situated offenders. Accordingly, this is also a basis for a variance.

Fourth, while nothing can overstate the seriousness of the offense conduct in this case — Edward directly facilitated the sale of fentanyl — the lengthy sentence provided by the U.S.S.G. guidelines range does not properly calibrate "just punishment" that is "sufficient but not greater than necessary" to meet the sentencing statute's goals. While lawmakers are understandably anxious to address our nation's opioid crisis, there is simply no empirical evidence that tougher prison sentences in line with the Guidelines are an effective means of deterrence in drug cases. See *United States v. Diaz*, No. 11-CR-00821 (JG), 2013 WL 322243, at * 1 (E.D.N.Y. Jan. 2013) ("the Guidelines ranges for drug trafficking offense are not based on empirical data, Commission expertise, or the actual culpability of defendants. If they were, they would be much less severe, and judges would respect them more.").

As a final thought, the attached character letters demonstrate that Edward is clearly a complex man who has struggled mightily as an immigrant to the United States; and yet Edward endures and is fortunate to have a loving family who have embraced him with open arms and

will always support him.  Edward is not beyond redemption, rather he is a man filled with an abundance of compelling qualities that speak to his hope and his good character.  Edward's "goodness" is a consistent theme found in each of the submitted letters, which speaks to his essential humanity.

We respectfully request the Court sentence Edward to a term of up to 36 months of imprisonment; needless to say we are cognizant that this request is a significant variance from the guideline range. However, it accurately reflects the unique circumstances of this case and the individual that is Edward.  In sum, the significantly below guideline sentence as requested by the defense would properly account for Edward's role in this offence, his prompt acceptance of responsibility, his Safety Valve proffer, his medical conditions, his lack of criminal record and his compelling personal history.

Sincerely,<br>
/s/<br>
Christopher Wright